**In the INTEREST OF H.C. and S.C., CHILDREN**

No. 04–96–00378–CV.

Court of Appeals of Texas, San Antonio.

Feb. 19, 1997.

---

William G. Delano, Jr., Michael D. Robbins, San Antonio, for Appellant.

Robert D. Byers, Zan Colson Brown, Sue T. Bentch, Karin R. Crump, St. Mary's Civil Justice Clinic, Angela Moore, Edward F. Shaughnessy, III, Assistant Criminal District Attorney, San Antonio, for Appellee.

Before HARDBERGER, C.J., and LÓPEZ and DUNCAN, JJ.

DUNCAN, Justice.

Adam Arguelles, father of S.C., and Rachel Santos, mother of H.C. and S.C., appeal from the termination of their parental rights.[1] We affirm.

## FACTS

The Texas Department of Protective and Regulatory Services (the Department) sought and received temporary custody of H.C. and S.C. after it had received a referral from La Petite Academy concerning several burn marks on S.C.'s buttocks. After speaking with the children, the Department, which had been dealing with Santos since 1991 for physically and emotionally abusing her children, determined that Santos intentionally burned S.C. on the back of his buttocks four times with an iron. Shortly thereafter, the Department filed a petition to terminate the parental rights of Santos and Arguelles. The case went to trial, and the jury found in favor of the Department. Both parents now appeal.

## TERMINATION

Arguelles and Santos argue in their first two points of error that the evidence is legally and factually insufficient to support the jury's finding that they (1) knowingly placed or knowingly allowed S.C. and H.C. to remain in conditions or surroundings that endangered the physical or emotional well-being of the child; or (2) engaged in conduct or knowingly placed S.C. and H.C. with persons who engaged in conduct that endangered the physical or emotional well-being of the child. *See* TEX. FAM.CODE ANN. § 161.001(1)(D), (E) (Vernon 1996). Additionally, Arguelles argues in his third point of error that termination is not in S.C.'s best interest. We disagree.

### *Standard of Review*

Involuntary termination proceedings must be strictly scrutinized. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex.1985). The Family Code mandates that a parent's parental rights can only be terminated by a showing of clear and convincing evidence. TEX. FAM.CODE ANN. § 101.007 (Vernon 1996); *In Interest of G.M.*, 596 S.W.2d 846, 847 (Tex. 1980). This court has previously held that the intermediate standard of review of clear and convincing will be used when an appellant challenges the factual sufficiency of the evidence. *See Anthony v. Mays*, 777 S.W.2d 200, 204 (Tex.App.—San Antonio 1989, no writ); *In Interest of T.M.Z.*, 665 S.W.2d 184, 186 (Tex.App.—San Antonio 1984, no writ).[2] In reviewing a jury's findings based on a clear and convincing standard, we ask our-

---

1. H.C.'s father voluntarily terminated his parental rights.

2. We recognize that the courts of appeal have disagreed over whether an intermediate standard of review should be used when reviewing termination proceedings. *See In Interest of J.J.*, 911 S.W.2d 437, 439–40, 440 n. 1 (Tex.App.—Texarkana 1995, writ denied). However, because termination proceedings concern the " 'basic civil rights of man,' " rights that are far more precious than mere property rights, *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972) (quoting *Skinner v. Okla-*

homa, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942)), "[w]e do not believe the Texas Supreme Court intends to require trial courts to adhere to a higher standard of proof in termination cases while allowing the courts of appeals to use the same standard of review as in cases decided by preponderance of the evidence." *In Interest of L.R.M. & J.J.M.*, 763 S.W.2d 64, 67 (Tex.App.—Fort Worth 1989, no writ). *See also* W. Wendell Hall, *Revisiting Standards of Review in Civil Appeals*, 24 ST. MARY'S L.J. 1041, 1149 (1993) (clear and convincing standard applied in review of termination cases).

selves whether sufficient evidence was presented to produce in the mind of a rational factfinder a "firm belief or conviction as to the truth of the allegations sought to be established." *In the Interest of G.M.,* 596 S.W.2d at 847. Arguelles and Santos also raise legal sufficiency complaints. In reviewing a legal sufficiency challenge, we "consider[ ] only the evidence and inferences that tend to support the finding, and disregard[ ] all inferences to the contrary." W. Wendell Hall, *Revisiting Standards of Review in Civil Appeals,* 24 St. Mary's L.J. 1041, 1133 (1993).

### Involuntary Termination

The Department sought to terminate Arguelles' and Santos' parental rights because they "knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[ren]; *or* engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren]." Tex. Fam.Code Ann. § 161.001(1)(D), (E) (Vernon 1996) (emphasis added). These alternatives are distinguished by the cause of the children's physical or emotional endangerment. *In Interest of S.H.A.,* 728 S.W.2d 73, 85 (Tex.App.—Dallas 1987, writ ref'd n.r.e.). "Under subsection (D), it must be the environment which causes the child's physical or emotional well-being to be endangered, as distinguished from the parent's conduct. Under subsection (E), the cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's acts but also by the parent's omissions or failures to act." *Id.* at 85.

■ Under either alternative, termination must also be in the best interests of the child. Tex. Fam.Code Ann. § 161.001(2) (Vernon 1996). Several factors may be considered in making this determination: the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parenting abilities of the individual seeking custody, the stability of the home or proposed placement, the parent's

acts or omissions indicating that the existing parent-child relationship is not a proper one, and any excuse for the parent's acts or omissions. *Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976); *Trevino v. Texas Dept. of Protective & Regulatory Serv.,* 893 S.W.2d 243, 248 (Tex.App.—Austin 1995, no writ).

### Adam Arguelles

■ Santos testified that, while giving birth to S.C. in September of 1989, she called Marylou Arguelles, Arguelles' mother, to inform her that Arguelles was the father of her child. Santos also claimed that S.C. was the result of a rape by Arguelles. Arguelles testified, on the other hand, he never raped Santos, and he did not discover he had a child until January of 1991, when he started a prison term for theft and aggravated robbery.

Arguelles gave contradictory testimony concerning his relationship with the Department. When asked if he had ever received any service plans from the Department, he initially responded that he never received any correspondence from the Department, only court orders. He later testified, however, he recalled reviewing some of the service plans sent by registered mail. Arguelles also claimed to have written a letter to Elizabeth Herrera, one of the caseworkers, asking her to mail a letter to S.C. Herrera, the Legal Ongoing Caseworker with Child Protective Services, testified that she received only one letter from Arguelles asking that his mother be allowed to visit S.C.; Arguelles expressed no concern for S.C. Herrera also testified the only thing asked of Arguelles was that he keep in contact with the Department, but did not do so. It was noted on the family service plans, however, that Arguelles was kept informed about S.C.'s welfare through his mother. None of the social workers who testified ever had any contact with Arguelles. Regarding child support, Arguelles testified that he had been ordered to pay child support of $5 dollars a month, but he sent no child support for S.C. between October 1993 and June 1994, even though he was receiving $20–$25 dollars a month from his mother and for a short time was receiving $75 every two weeks. Finally, Arguelles testified he knew

of Santos' treatment of H.C. and was concerned for S.C., "but did nothing about them," even though the family service plans he received stated that S.C. was being placed with a relative due to Santos' physical abuse. Additionally, Arguelles' mother was given temporary custody of S.C. for eleven months beginning in May 1993 because of concerns for S.C.'s physical safety. Arguelles told the jury that once he is released from prison, he would seek full custody of both H.C. and S.C. Arguelles is not expected to be released from prison until the year 2000.

The evidence presented was sufficient to produce a firm belief or conviction that Arguelles either knowingly placed or knowingly allowed S.C. to remain in conditions or surroundings that endangered the physical or emotional well-being of the child or engaged in conduct, or knowingly placed S.C. with persons who engaged in conduct, that endangered the physical or emotional well-being of the child. *See D.O. v. Texas Dept. of Human Serv.*, 851 S.W.2d 351, 355 (Tex.App.—Austin 1993, no writ) (father allowed child to remain in abusive environment); *In Interest of L.S., P.P., G.S., & M.S.*, 748 S.W.2d 571, 575 (Tex. App.—Amarillo 1988, no writ) (mother allowed children to remain in surroundings in which sexual abuse was occurring). Accordingly, we overrule Arguelles' first two points of error.

■ With respect to S.C.'s best interest, several witnesses testified that there is a very real danger that S.C. will be subjected to further abuse if he remains in his current surroundings. Arguelles testified that he cannot take custody of S.C. until released from jail in the year 2000, leaving S.C. in foster care for another three years even though S.C.'s aunt desires to adopt both S.C. and H.C., who are thriving in her home. Finally, testimony was presented that it would be detrimental for S.C. and H.C. to be separated. Based upon our review of the record, we hold that the evidence presented was legally and factually sufficient to show that the termination of Arguelles' parental rights was in the best interest of S.C. *See Trevino*, 893 S.W.2d at 252; *see also Stuart v. Tarrant County Child Welfare Unit*, 677 S.W.2d 273, 281 (Tex.App.—Fort Worth

1984, writ ref'd n.r.e.), *overruled on other grounds, In Interest of W.S.*, 899 S.W.2d 772 (Tex.App.—Fort Worth 1995, no writ). Arguelles' third point of error is therefore overruled.

### Rachel Santos

■ Santos testified she did not know how S.C. was burned because she was not present when the accident happened and did not discover that S.C. had been burned until she went to wake him up for school. After noticing S.C. was not out of bed, she went to S.C.'s room to ask him why he would not get up; S.C. answered that he was hurt. Santos saw S.C.'s burns and applied some ointment and bandaged them, but she did not take S.C. to a doctor because she was already giving him medical treatment. Santos, who testified S.C. was accident prone, suspected the accident happened when she left an iron on while she was taking a shower. Santos also testified, however, she did not hear S.C. cry or scream. S.C. also gave no indication there had been an accident when the family went out later that evening. According to Santos, S.C. told her several versions of the accident, one of which was that he fell on the iron while jumping on the bed.

CPS caseworker Guadalupe Salas testified she received a call regarding S.C. from La Petite Academy on June 16, 1994. When Salas went to investigate, she noticed S.C. had gauze bandages on his buttocks and could not sit down. Salas spoke with Santos, asked her what happened, and then told Santos to take S.C. to a doctor. Santos refused. A few days later Santos told Salas she had taken S.C. to a doctor, but she would not tell Salas when she took S.C. or who the doctor was. Salas, accompanied by another caseworker, then went to Santos' apartment and spoke with the children. When asked if she knew what happened to S.C., H.C. told Salas that, when S.C. had taken a ball from another sibling, Santos called him over and told him to pull down his pants and bend over. Santos then plugged in the iron and proceeded to burn S.C. H.C. also told Salas she was fearful of her mother. Salas testified S.C. initially told her a different story. It was not until H.C. told S.C. "[i]ts okay to tell the

truth" that S.C. said his mother had burned him. Salas felt termination was warranted because the emotional and physical needs of the children were not being met, there was a great risk the abuse would reoccur, and the children could not be protected in the home.

Bob Whiting, the Court Appointed Special Advocate assigned to H.C. and S.C. since January of 1994, testified that Santos told him S.C. had been bouncing on the bed, fell off, and burned himself. Whiting also testified that he had seen the burn marks and did not believe they were the result of an accident.

Dr. Juan Parra examined S.C. approximately ten days after the injury occurred. According to Dr. Parra, S.C.'s injuries were not consistent with a child jumping on a bed and falling off; the injuries were more consistent with the flat touching of an iron. Furthermore, Dr. Parra testified that an average person would resist being repeatedly burned due to the amount of pain involved. Because of the pattern of the burn marks and because Santos delayed in seeking treatment for S.C., Dr. Parra ruled out accidental injury, and ultimately diagnosed S.C. as having suffered child abuse, including emotional abuse.

Kathy Parr, also with CPS, had been working with Santos since 1991, when CPS' goals were to eliminate Santos' tendency to over-discipline her children and to stop the physical and emotional abuse she inflicted on them. The case was initially opened because there was concern about how Santos treated S.C. According to Parr, Santos made S.C. the scapegoat for all her problems and would whip him. Regarding the burning incident, Parr testified that Santos told her H.C. and S.C. were jumping around the room and S.C. accidently hit an iron that was on the floor. Santos also said she was not in the room when the accident happened. When Parr interviewed the children on June 17, 1994, S.C. came to her and said "[m]y mommy told me to tell you that I was jumping on the bed and hit the iron." Finally, Parr testified H.C. was "very distressed " and "very scared" about having to tell her what happened and "was afraid to go home because

her mother would be mad at her for telling . . . ."

Herrera testified that she believed Santos' rights should be terminated because Santos would not participate in any of the services arranged for her, she had only sporadic visits with the children since they were removed from her home, and there was no stability in her home. Herrera stated the Department made every effort to reunite the family but was unsuccessful. She also testified Santos refused to participate in any of the services offered to her after the burning incident.

H.C.'s elementary school teacher, Vicky White, testified that, while she reported some bruising to the school principal, Gale Fordice, she did not notice any parental neglect of H.C., who appeared to be well taken care of. Fordice confirmed that White reported to her on two occasions regarding bruising on H.C. and she made several reports concerning neglect or excessive treatment in the home when H.C. exhibited unusual behavior in the classroom. Finally, Fordice testified that she noticed that H.C. was not well-dressed and did not have good hygiene.

The children's clinical social worker, Linda Mockbridge, who had been seeing them since 1993, testified that both children had suffered emotional trauma, and H.C. witnessed most of Santos' yelling and some of her hitting. Lastly, Lillie Espervoa from CPS testified the Department could never substantiate physical abuse of H.C., but "a lot of the physical abuse of S.C. occurred in H.C.'s presence."

Based upon our review of the evidence presented in this case, we hold the evidence was sufficient to produce a firm belief or conviction in a rational factfinder that Santos either knowingly placed or knowingly allowed H.C. and S.C. to remain in conditions or surroundings that endangered the physical or emotional well-being of the children or engaged in conduct, or knowingly placed H.C. and S.C. with persons who engaged in conduct, that endangered the physical or emotional well-being of the children. *See Dupree v. Texas Dept. of Protective & Regulatory Serv.*, 907 S.W.2d 81, 84 (Tex.App.— Dallas 1995, no writ) (mother used crack cocaine during pregnancy); *In Interest of*

S.H.A., 728 S.W.2d at 86–87 (child was malnourished and parents failed to seek medical treatment for child). Accordingly, we overrule Santos' first and second points of error.

### JURY INSTRUCTION

 In her final point of error, Santos argues the trial court erred in denying her requested jury instruction on the presumption in favor of keeping children in the custody of their parents.[3] While we agree with Santos that there is a strong presumption that a child's best interest is served by keeping them with their natural parents, *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex.1976), this presumption ceases, and the case proceeds as if no presumption ever existed, when evidence to the contrary is introduced. *Director of Dallas County Child Protective Services Unit of Texas Dept. of Human Services v. Bowling*, 833 S.W.2d 730, 732 (Tex. App.—Dallas 1992, no writ); *Ziegler v. Tarrant County Child Welfare Unit*, 680 S.W.2d 674, 676 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.); *In Interest of Guillory*, 618 S.W.2d 948, 951 (Tex.App.—Houston [1st Dist.] 1981, no writ). Once the Department introduced evidence of Santos' emotional and physical abuse of her children, the presumption disappeared, "and 'is not to be weighed or treated as evidence.'" *See In the Interest of Baby Girl Rodriguez*, 940 S.W.2d 265, 271 (Tex.App.—San Antonio 1997, n.w.h.) (quoting *General Motors Corp. v. Saenz*, 873 S.W.2d 353, 359 (Tex.1993)). Accordingly, we overrule Santos' third point of error.

The judgment is affirmed.

---

3. Santos requested the trial court to submit the following instruction as part of the jury charge: Usually, the best atmosphere for mental, moral and emotional development of the child is with its natural parents, and there is a strong presumption that a child's foremost interest is usually best served by keeping custody in and with the natural parent.