

**NUMBER 13-08-00652-CV**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI - EDINBURG**

**IN THE INTEREST OF J.T., A CHILD**

**On appeal from the 267th District Court of Jackson County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Garza and Vela**
**Memorandum Opinion by Justice Garza**

This is an appeal from a final order terminating the parental rights of Lucy and Robert, the mother and father of J.T.[1] By two issues, Lucy argues that the State failed to prove by clear and convincing evidence that she: (1) engaged in conduct or knowingly placed J.T. in the care of others engaging in conduct which endangered the well-being of J.T.; and (2) failed to comply with the court-ordered family service plan. *See* TEX. FAM. CODE ANN. § 161.001(1)(E), (O) (Vernon 2008). By three issues, Robert contends that the

---

[1] To protect the privacy of the minor child, mother, and father, we refer to the mother as Lucy, the father as Robert, and the child by her initials. *See* TEX. FAM. CODE ANN. § 109.002(d) (Vernon 2008); TEX. R. APP. P. 9.8(b)(2). Both of the names we use for the mother and father are fictitious. *See* TEX. R. APP. P. 9.8(b)(2).

evidence supporting the trial court's termination order is insufficient because: (1) his failure to comply with the court-ordered family service plan was due to his incarceration; (2) his conviction for injury to J.T. is not a final judgment; and (3) the testimony at trial suggests that the injuries sustained by J.T. were accidental. *See id.* § 161.001(1)(E), (L), (O). We affirm.

## I. FACTUAL BACKGROUND

On May 18, 2007, J.T. was removed from the custody of Lucy and Robert by Texas Department of Family and Protective Services ("TDFPS") officials after an incident transpired that nearly cost J.T. her life. Lucy and Robert were dating at the time of the incident.[2]

On May 15, 2007, Lucy and Robert were staying at the Six Flags Motel in Victoria, Texas. Lucy recalled that J.T. was "kind of cranky" when she tried to take J.T. out of her car seat that evening. Robert instructed Lucy to leave J.T. in his care while Lucy took a shower. Lucy testified that Robert seemed agitated, but he reassured her that he would get J.T. to go back to sleep.

While she was in the shower, Lucy heard a loud cry emanate from the bedroom. Lucy, still in the shower, asked Robert what had happened. Robert informed Lucy that he was changing J.T.'s dirty diaper and that nothing out of the ordinary had occurred. Apparently satisfied with Robert's answer, Lucy completed her shower. Upon exiting the bathroom, Lucy checked on J.T. and noticed that she was asleep and appeared fine. Lucy checked on J.T. again at 11:00 p.m. and at one or two o'clock in the morning, and J.T. appeared to be fine. Lucy then went to sleep. She was awakened by J.T.'s stirring at about 3:00 a.m. Lucy stated that J.T. "kind of whined a little bit," so she got up and

---

[2] At the time of trial, J.T. was two years old.

proceeded to feed J.T. and give J.T. her medicine.[3]  Lucy did not recall any swelling or bruising on J.T.'s body when she was feeding her.  Once she finished feeding J.T., Lucy burped J.T. and the following took place:

> I was trying to burp her and she was kind of whining a little bit and I could hear him [Robert]. . . .
>
> And he's like, I got to get up in the morning, you know, so I walked into the bathroom with her and I'm burping her and the light's off.  I didn't want to turn the light back on because I didn't want her to get good and awake, so I was trying to burp her and she throws up all over the place, all over me, all over her, and big quantity of it, so I hit the light and I was just, I didn't know what was going on, you know.  I've never seen her throw up that much ever, so it was like everything she ate and everything prior to that, and I called him in there because her head was—it looked really weird to me, like it was really, it was swollen on the sides right here and I thought I was seeing stuff, so I called him in there.

Lucy then left J.T. in Robert's custody and ran across the street to use a pay phone at Walgreens.  Lucy called her mother to inform her about J.T.'s condition.  Lucy's mother arrived at the motel approximately twenty minutes later and drove J.T. and Lucy to the nearby hospital.  After an initial examination, J.T. was air-lifted to a San Antonio hospital by helicopter.  Lucy testified that at this time, J.T. was drowsy and her head was swelling.

Lucy testified that she never witnessed Robert mishandle J.T., but that Robert was sometimes "a little harsh . . . [o]n his attitude towards her [J.T.]."  Ultimately, Lucy admitted that J.T. had been physically abused.  When asked whether she could protect J.T. from future abuse, Lucy believed that she could.  However, when questioned whether she protected J.T. when she was dating Robert, Lucy stated that she did not.  Lucy stated that she initially believed that J.T.'s injuries were the result of an accident, but that she no longer believed that to be true.

With respect to her current living situation and employment status, Lucy testified

---

[3] At the time of the incident, J.T. was taking medication for congestion.

that: (1) she is "not exactly on [her] own just yet"; (2) she still lives with her mother and that things would be easier if her mother "was in the picture"; and (3) she was not working at the time of trial. On re-direct examination, Lucy admitted that she was aware that Robert had previously been arrested for theft but no other crimes and that, prior to this incident, she did not realize that anyone was abusing J.T. Lucy denied any responsibility for any of J.T.'s injuries. Finally, Lucy testified that she smoked marihuana "off an[d] on when I was a kid" and that she continued smoking marihuana until she was pregnant with J.T.[4]

Nancy Kellogg, M.D., a professor of pediatrics at The University of Texas Health Sciences Center at San Antonio, reviewed J.T.'s medical records and stated that J.T. had several injuries to her head and other parts of her body in different stages of healing. Dr. Kellogg believed that J.T. had sustained at least four severe impacts to her head that could not have been caused by accident. Based on the medical records, Dr. Kellogg informed the trial court that J.T. had two skull fractures—one on the right and the other on the left side of her head. When asked about how a ten-month old child could get two skull fractures, Dr. Kellogg responded that two separate blows were the most likely explanation and that the amount of force required to cause the skull fractures would have been very severe. In fact, the skull fractures caused J.T.'s head to be partially dented, and the fractures were diastatic in nature, meaning that the sutures that hold the cranial bones together had split. J.T. also had a severe brain contusion, bruising on her left cheek, left

---

[4] With respect to the last time Lucy abused drugs, the following exchange took place:

| | |
|---|---|
| Q: [Counsel for the TDFPS] | When did you—when was the last time you used [drugs]? |
| A: [Lucy] | It's been about two and a half years. |
| Q: | That's about when you were pregnant with [J.T.]? |
| A: | Yes. |

4

eye, and left ear, bruising of the abdomen, bruising of her back, and bruising to much of her forehead. Dr. Kellogg stated that J.T. sustained massive bleeding to her head that required numerous blood transfusions. In fact, J.T. lost about one-third of her blood volume and without the blood transfusions, J.T. would have died.

Doctors also discovered that: (1) J.T. had a fractured tenth rib that was ten days to three weeks old; and (2) a healing fracture on her left tibia that was a metaphyseal-buckle fracture that was ten days to three weeks old. Dr. Kellogg testified that metaphyseal injuries are most associated with abuse, especially concerning a child that is not yet running and noted that:

> It is not a common injury . . . . Well, the kind that she had is the, what we call a compression fracture, which means there was compression on the leg at the heel, the foot level, upward, which can happen in a few different ways. Either the child is forcefully slammed down onto a object or hoisted on the bottom, where somebody can take the foot or ankle and jam it upward, so it's a longitudinal compressive type of force.

When questioned further about the characteristics of metaphyseal injuries, Dr. Kellogg stated that: "[I]t's a very unusual fracture. I mean, normal activity would not cause this. This would be something that would result in pain to the child, so there is a good deal of force that's involved. . . ." Dr. Kellogg ruled out brittle bone disease and J.T.'s premature birth as potential causes for the fractured rib and tibia. Based on her experience, Dr. Kellogg believed that J.T.'s injuries were the result of physical abuse.

Officer Kevin Kroos, a detective with the Victoria Police Department, testified that he was involved in the investigation of the suspected abuse of J.T. Officer Kroos recalled conversations with Lucy in which she consistently stated that she was unaware of what had happened to J.T. that evening. However, Officer Kroos stated that when he first spoke with Robert, Robert denied having any knowledge about how J.T. was injured. Approximately

5

one week later, Robert changed his story and noted that the whole incident was an accident—that J.T. had bitten him on the shoulder while he was holding her; that he jerked her away; and that he dropped her and she fell to the floor and struck her head. Robert never suggested that Lucy had abused J.T. On cross-examination, Officer Kroos remembered that Lucy did not appear to be a caring person or overly emotional about the injuries that J.T. had sustained. Officer Kroos believed that Lucy's reaction to the incident was abnormal.

Shirley Johnson, a licensed professional counselor, testified that Lucy had been a client of hers since November 2007. The purpose of Lucy's visits with Johnson was to help Lucy with parenting skills. At the time of trial, Johnson had met with Lucy thirty-five times, and Johnson noted that Lucy had made some progress with the parenting classes. However, Johnson stated that she did not believe Lucy could care for J.T. on her own, although she may be able to care for J.T. with adequate supervision. In speaking with Lucy, Johnson learned that Lucy's father had a history of physically abusing her mother. Lucy also disclosed to Johnson that J.T.'s broken rib and tibia had occurred when J.T. was in Robert's care. Based on her interactions with Lucy, Johnson opined that Lucy and J.T. did not have a bond and that Lucy was not mature enough to care for J.T.

Robert testified that at the time of trial, he was serving a thirty-year sentence for injury to a child.[5] Robert admitted that in the past he had: (1) made a terroristic bomb threat to a middle school; (2) pleaded guilty to burglary of a vehicle; (3) pleaded guilty to theft of property valued under $500; and (4) was placed on juvenile probation for carrying

---

[5] Chris Canales, a patrol officer with the Victoria Police Department, testified that Robert had some outstanding warrants at the time Robert was first contacted about the incident and that Robert's initial arrest pertained to the outstanding warrants. Robert was later indicted with injury to a child, a first-degree felony, based on the May 15, 2007 incident and was subsequently convicted and sentenced to thirty years' incarceration for his participation in the incident. *See* TEX. PENAL CODE ANN. § 22.04(a)(1), (e) (Vernon Supp. 2008).

6

knives to school. Robert testified that when he first met Lucy, he was "doing a lot of cocaine," "popping pills," and "smoking a lot of weed." In addition, Robert admitted to drinking a lot when he first met Lucy. However, once he met Lucy, Robert "stopped doing everything except weed—marijuana." Robert, however, contradicted himself when he recalled that he and Lucy used to pop pills—"hydrocodone and Lortabs"—and smoke weed. Unbeknownst to Lucy's mother, Robert and Lucy stole the pills from Lucy's mother's house. When asked about J.T.'s whereabouts when they abused drugs together, Robert mentioned the following:

> Most of the time we'd wait until she goes to sleep and we'd cut down a lot whenever we found out that she was pregnant. I still smoked because, you know, she was the one that was pregnant. She wanted me to hold back and, you know, don't smoke around her because she would get contact and it would be bad for the baby and so most of the time I'd go outside and with the pills I only did that like maybe once every six months.

> Whenever she had [J.T.], we'd wait for her to fall asleep. It was almost at the end of the week and whenever her mom [was] willing to babysit, we would go to town, get groceries and rent movies and then whenever everybody was asleep[,] we'd go out and smoke. Never around [J.T.].

Robert was then questioned about J.T.'s fractured tibia to which he responded:

> The leg—when I was changing her, again, when she was fresh home from the hospital, after she just had her, I lifted her legs up to change her and I lifted them up too high and I didn't know how high you were supposed to lift them up and instead of putting them back towards her like she's on her back[;] instead of lifting the legs making her feet go in the direction of her head like in a 90 degree angle, I lifted up to where her little butt came up and her ankles crossed like that and I had my hands like that and I didn't know I did it wrong and apparently that was wrong.

> I didn't jerk or yank or anything, but just that fact alone that I grabbed her the wrong way would make me assume that it was probably me just being—

Robert later admitted that he physically assaulted Lucy. He stated that: (1) the abuse started when Lucy was "a couple of months pregnant"; (2) he did not know how to

handle Lucy's mood swings; and (3) he was frequently high. Robert further admitted that he had: (1) punched Lucy in the cheek with a closed fist; (2) kicked her in the stomach; and (3) put a towel around her neck and threatened to choke her. Furthermore, Robert testified that he had previously slapped his mother out of anger.

With respect to the May 15, 2007 incident, the following exchange occurred:

Q: [Counsel for TDFPS]     At any point while [Lucy] was in the shower did you bump [J.T.'s] head on any object?

A: [Robert]     Yes. Whenever [Lucy] was in the shower, she had asked me why [J.T.] was crying and I told her because I'm changing her diaper and she said, okay, well, she's crying very loud, and she's crying real loud. Is she okay. I said, yeah. [Lucy's] head is sticking out of the shower door because the shower and the bed where I was changing [J.T.] is real close.

After I got done changing [J.T.], I carried her right here on my right arm like where her legs are hugging my hip and I've got my arm behind her back. I've got the dirty diaper in my left hand and I go over to the restroom and I tell [Lucy], I was like, is—[Lucy] said, she does baby talk to [J.T.]—she's like, what's the matter baby, but she does it in baby talk and I said, see, there's mom, say hi and [Lucy] is like, okay, well, I need to finish up. I was like all right.

Then when I go to close the door [Lucy] had just closed her shower door, and when I turned, I've still got the dirty diaper in my left hand I've got [J.T.] in my right and whenever I scoot [J.T.] up a little bit because she was kind of sliding a little bit that's basically when she bit me and I jerked and the back left side of her head, more towards the side, hit the edge of the counter.

. . . .

Whenever she hits I go to, when I jerk her back and she hits and I hear the pop around

8

the same time I hear the shower door close. I feel the loss of weight in my right hand and I swing my left hand to come behind the head. Well, that pamper has a little sticky thing on the sides and whenever you close the diaper you got to criscross [sic] it.

Well, the sticky part stuck to the inside of my hand between the index finger and the thumb so whenever I went to go scoop underneath her head, her head hit the pamper and, you know, she kept on sliding and I used my fingers to try to grip whatever I could, which was hair and she still kept on sliding so when she's tumbling, on her way down, her back is leaning backwards and I missed her head so I let go of her legs while she's almost about to be completely upside down and I try to scoop back up because I—I totally disregard my left arm at this point.

I scoop up like this to try to cradle her up to my chest and she just slides right through because I wasn't quick enough. It happened pretty fast. Whenever she slid through, she landed on the ground with her head towards my side and her feet towards the other direction and her face is facing the restroom door. It would probably be, I think it was her left cheek, if I'm not mistaken.

Robert did not report the accident immediately and, instead, kept the information about the accident to himself. After J.T. fell to the floor, Robert checked J.T.'s head for bumps and her body for cuts, bruises, or bleeding. J.T. was not crying at this point. Robert alleged that J.T.'s injuries were not caused by the accident that occurred on May 15, 2007, and that he had never committed any violent acts towards J.T. Robert noted that he enrolled in parenting classes and anger management classes that were available at the jail.

Julie Murphy, an investigator for the TDFPS, took over J.T.'s case in July 2007. Murphy recalled that Lucy had complied with the family service plan "to some extent." However, Lucy had numerous "no-call no-shows" with the counseling service, and Lucy

9

refused to allow the parenting-homemaker provider to come to her mother's house, which resulted in a delay in services. Lucy disclosed to Murphy that her father sometimes stayed at her mother's house.[6] In describing Lucy's visits with J.T., Murphy stated that:

> There was a lot of disconnection. It didn't really seem like she [Lucy] had much of a connection to her child, like she didn't know what to do with her. There was a lot of watching. [J.T.] would kind of do her own thing—play with toys—and she would just observe.

Murphy did not believe that there was an appropriate bond between Lucy and J.T. Additionally, Murphy noted that parents generally have responsibility for the safety of their own children.

Natalie Falcon, a caseworker with the TDFPS, became Lucy's caseworker in November 2007. Falcon informed both Lucy and Robert about their obligations under the court-ordered family service plans. Pursuant to the family service plans, Lucy and Robert were required to complete a drug and alcohol assessment, a psychological evaluation, anger management classes, parenting classes, and individual therapy. They were also required to: (1) register with the Work Force Solution organization to obtain stable employment; (2) participate in parent-child visits; (3) maintain stable housing; (4) keep in contact with the assigned caseworker; and (5) understand the severity and nature of the injuries J.T. sustained.

Lucy and Robert both reviewed the family service plans and according to Falcon, Robert had not made any progress on his plan at the time of trial.[7] Lucy, on the other

---

[6] Robert testified that Lucy's father was a violent man who was addicted to pills and alcohol and had just been released from prison. Lucy's mother confirmed that her ex-husband stayed at the house on occasion; that he had previously physically assaulted her; and that he had drug and alcohol problems.

[7] Falcon testified that she believed that the jail where Robert was housed provided some parenting classes for inmates; however, Robert did not provide any documentation to the TDFPS demonstrating that he had attempted to take advantage of those classes.

hand, completed a psychological evaluation and was participating in counseling. Lucy also underwent a drug and alcohol assessment and was in the process of completing her parenting courses. However, Falcon testified that the TDFPS did not consider Lucy's drug and alcohol assessment to be valid because it was premised primarily on self-reports of drug and alcohol consumption by Lucy and because Robert stated that Lucy abused drugs both before and after J.T.'s birth. Despite the TDFPS's suspicions, all of Lucy's drug screens were negative. Lucy reported to Falcon that she had recently started working at Olive Garden, but she quickly quit that job due to an injury and had not reported any other employment since then.[8] Lucy completed her anger management classes, but at the time of trial, she had not obtained independent housing. Falcon noted that Lucy had participated in all of her visits with J.T.; however, Lucy was regularly late for the appointments. In participating in the visits with J.T., Falcon recalled that Lucy would simply observe J.T. and did not seem to know how to play with J.T. appropriately. In addition, Lucy invariably was accompanied by her mother on the visits, and Falcon stated that Lucy's mother interacted more with J.T.

Falcon testified that she was very concerned about Lucy's ability to protect J.T. from future abuse and that she did not believe Lucy and J.T. were bonded as mother and daughter. Because Lucy is "very naive," "immature," and "more interested in getting her way as opposed to the welfare of her child," Falcon did not believe that Lucy could care for J.T. properly.[9] Based on these observations, the long-term goal of TDFPS was termination

---

[8] Falcon noted that Lucy was not able to provide the TDFPS with paycheck stubs verifying that she had been employed by Olive Garden.

[9] On one visit, Falcon observed that J.T. bumped her head while in Lucy's care.

of Lucy and Robert's parental rights.[10]

Lucy's mother testified on Lucy's behalf and stated that she did not believe that J.T. had a broken rib or leg or that Lucy posed a threat to J.T.'s physical or emotional well-being. She did believe, however, that Robert had purposefully caused J.T.'s injuries. On cross-examination, Lucy's mother admitted that she used to work twelve to eighteen-hour shifts at her job and that the house was not well maintained; however, she stated that she no longer works, and she is determined to follow TDFPS directives and help Lucy raise J.T.[11] Lucy's mother also noted that Lucy was hired by the YMCA in Victoria that morning.

Christine Hartley-Harvey, a program director for Reclamation Counseling Center, a homemaker parenting service organization, testified that Lucy was one of her clients and that she first met Lucy on June 2, 2008. Hartley-Harvey observed a visit between Lucy and J.T. and noted that:

> There was little to no bonding between [J.T.] and [Lucy]. [Lucy's] affect was really flat. She showed no emotions. The child initiated—the child interacted more with [Lucy's] mother . . . . Some of the safety issues were [Lucy] would hold [J.T.] up over her head like that and shake her and play with her and that was one of my concerns because with having the brain injuries—you don't want to shake a child anyway—but having a brain injury you really don't want to. Just—there was just a lot of different things that I noticed in that visit.

Hartley-Harvey also visited Lucy at her mother's home to see if Lucy was able to implement some of the parenting skills she claimed she had or should have learned. Hartley-Harvey recalled that Lucy was "real inconsistent" and that "[s]he would look more

---

[10] At the time of trial, J.T. resided with a relative. Kathy Cornett, a Court-Appointed Special Advocate ("CASA") caseworker, recommended that J.T. be adopted by her current foster family. Cornett also noted that she did not believe Robert's account of how J.T. was injured and that J.T. would be safe living with Lucy or Robert.

[11] Lucy's grandmother also testified on Lucy's behalf and stated that: (1) she has a close relationship with Lucy; and (2) she would be available to help Lucy raise J.T.

to her mother to discipline the child than she would herself." At the time of trial, Lucy had not completed her parenting classes, and Hartley-Harvey did not believe that Lucy had a good understanding of what she was trying to teach her with respect to child safety and parenting. In fact, although Lucy had been attending parenting classes for approximately one year, Hartley-Harvey observed that "she's still unable to implement a lot things" that the program was trying to teach her. Hartley-Harvey testified that of the sixteen scheduled visits with Lucy, Lucy missed or rescheduled eight. Hartley-Harvey believed that Lucy was capable of understanding what she is taught; however, she was unwilling to learn appropriate parenting skills. Finally, Hartley-Harvey raised concerns about Lucy's mother's home, where Lucy planned to reside if the trial court had granted her custody of J.T. Hartley-Harvey was concerned that there was:

> trash everywhere; clothes strewn everywhere; lighters sitting around; coins—just things that little kids can get into and get hurt with. She's been able to correct a lot of that. The outside is really overgrown. There's been a dead skunk in the driveway right there where I get out of the car. There's been a dead possum. I'd be concerned about snakes because the grass is so tall right in the proximity of, you know, the home.

## II. PROCEDURAL BACKGROUND

On May 18, 2007, the Texas Department of Family and Protective Services filed its original petition for termination of Lucy's and Robert's parental rights. After a home study was conducted, J.T. was placed with Lucy's sister's family. Later, the TDFPS filed copies of the family service plans issued to both Lucy and Robert.

Subsequently, on October 13, 2008, the trial court conducted a final hearing on the termination of Lucy's and Robert's parental rights. On November 5, 2008, the trial court signed a termination order stating that the trial court had found by clear and convincing evidence termination was in J.T.'s best interest and that: (1) Lucy endangered the physical

13

and emotional well-being of J.T. and had failed to comply with the family service plan; and (2) Robert had endangered the physical and emotional well-being of J.T., knowingly engaged in conduct that resulted in a criminal conviction and imprisonment which prevented him from caring for J.T. for not less than two years, and failed to comply with the family service plan.  *See id.* § 161.001(1)(E), (L), (O), (2).

On November 14, 2008, Lucy filed a motion for new trial and statement of points, alleging that there was insufficient evidence to support the trial court's grounds for termination and findings that termination was in the best interest of J.T.  *See id.* § 263.405(b), (i) (Vernon 2008) (providing that a party appealing a final order in a termination case must file a statement of points within fifteen days of the trial court's signing of the final order and that appellate courts may not consider any issue not specifically presented in the statement of points); *see also In re K.C.B.*, 251 S.W.3d 514, 515 (Tex. 2008) ("As a prerequisite to appellate review, the Texas Family Code requires a party whose parental rights have been terminated to timely file with the trial court a statement of points on which the party intends to appeal.").

On November 19, 2008, Robert filed his motion for new trial and statement of points asserting that:  (1) his conviction for injury to a child was not a final conviction because it had been appealed; (2) the evidence established that the injuries sustained by J.T. were accidental; and (3) he was unable to comply with the family service plan because he was incarcerated.  *See* TEX. FAM. CODE ANN. § 263.405(b), (i); *see also In re K.C.B.*, 251 S.W.3d at 515.  The trial court denied Robert's motion for new trial and allowed Lucy's motion for new trial to be overruled by operation of law.  *See* TEX. R. CIV. P. 329b(c). Robert also requested findings of fact and conclusions of law.  On November 25, 2008, the trial court issued findings of fact and conclusions of law, in which it made thirty-two findings

14

of fact and seventeen conclusions of law pertaining to both Lucy and Robert. This appeal ensued.

### III. TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.–Corpus Christi 2006, no pet.). Termination must be supported by clear and convincing evidence. *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005); *In re D.S.P.*, 210 S.W.3d at 778. This intermediate standard falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.–Fort Worth 2006, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2008); *see In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).

Before terminating parental rights, the trial court must find that the parent committed an act prohibited by section 161.001(1) of the Texas Family Code and that termination is in the best interest of the child. *Id.* §§ 153.002 (Vernon 2002), 161.001; *see In re J.L.*, 163 S.W.3d at 84; *see also Liu v. Dep't of Family & Protective Servs.*, 273 S.W.3d 785, 790 (Tex. App.–Houston [1st Dist.] 2008, no pet.). When considering whether parental termination is in the child's best interest, the following non-exhaustive list of factors should be considered: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in

the future; (4) the parenting abilities of the parties seeking custody; (5) the programs available to assist the parties seeking custody; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions committed by the parent. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The party seeking parental termination is not required to prove all nine factors. *See In re C.H.*, 89 S.W.3d at 27 (providing that these considerations are not exhaustive, "or that *all* such considerations must be proved as a condition precedent to parental termination") (emphasis in original); *In re J.R.S.*, 232 S.W.3d 278, 284 (Tex. App.–Fort Worth 2007, no pet.) ("These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.").

## IV. ENDANGERMENT AND SECTION 161.001(1)(E) OF THE FAMILY CODE

Endangerment means to expose to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.–Fort Worth 2003, no pet.); *see also In re M.C.*, 917 S.W.2d 268. 269 (Tex. 1996). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of Robert's conduct, including acts, omissions, or failures to act. *See* TEX. FAM. CODE ANN. § 161.001(1)(E); *see also In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.–Houston [14th Dist.] 2005, no pet.) ("[A] child is endangered when the environment or the parent's course of conduct creates a potential for danger which the parent is aware of but disregards."); *In re J.T.G.*, 121 S.W.3d at 125. Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the

16

parent is required. *In re J.T.G.*, 121 S.W.3d at 125; *see* TEX. FAM. CODE ANN. §

161.001(1)(E). However, it is not necessary that the parent's conduct be directed at the

child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121

S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental

misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738

(Tex. App.–Fort Worth 2004, pet. denied). To determine whether termination is necessary,

courts may look to parental conduct occurring both before and after the child's birth. *In re

D.M.*, 58 S.W.3d 801, 812 (Tex. App.–Fort Worth 2001, no pet.).

Stability and permanence are paramount in the upbringing of children. *See In re

T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.–Fort Worth 2002, pet. denied). A fact finder may

infer from past conduct endangering the well-being of the child that similar conduct will

recur if the child is returned to the parent. *See In re D.L.N.*, 958 S.W.2d 934, 941 (Tex.

App.–Waco 1997, pet. denied), *disapproved on other grounds by In re J.F.C.*, 96 S.W.3d

256 (Tex. 2002) and *In re C.H.*, 89 S.W.3d at 17.

## V. STANDARD OF REVIEW

In reviewing the legal sufficiency of the evidence supporting parental termination,

we must "look at all the evidence in the light most favorable to the finding to determine

whether a reasonable trier of fact could have formed a firm belief or conviction that its

finding was true." *In re J.L.,* 163 S.W.3d at 85. We must assume that the trier of fact

resolved disputed facts in favor of its finding if it was reasonable to do so. *Id.* We must

also consider undisputed evidence, if any, that does not support the finding. *Id.* at 86.

In reviewing the evidence for factual sufficiency, we must give due deference to the

fact finder's findings and not supplant the judgment with our own. *In re H.R.M.,* 209

S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a fact

finder could reasonably form a firm conviction or belief that the parent violated the relevant conduct provision of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. *In re C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *In re H.R.M.,* 209 S.W.3d at 108.

### VI. ROBERT'S ARGUMENTS ON APPEAL

By his third issue on appeal, Robert asserts that the evidence adduced at trial was insufficient to support the trial court's termination of his parental rights. Specifically, he alleges that the injuries sustained by J.T. on May 15, 2007 were accidental and that he did not engage in conduct that endangered the physical or emotional well-being of J.T. *See* TEX. FAM. CODE ANN. § 161.001(E).

### A. Endangerment of J.T.'s Physical or Emotional Well-Being

At trial, Robert testified that all of the injuries that J.T. sustained were accidental; however, Robert's testimony was belied by: (1) the fact that he changed his story about the May 15, 2007 incident when he was interviewed by Officer Kroos; and (2) the testimony of Lucy, Lucy's mother, and Dr. Kellogg. Dr. Kellogg stated that the injuries that J.T. sustained were so severe that they could not have been accidentally caused and that J.T. nearly died as a result of the injuries. Based on her medical training and experience, Dr. Kellogg opined that J.T. had been physically abused. Lucy and Lucy's mother recounted Robert's past history of family violence, and both stated that they believed that Robert had intentionally harmed J.T. Besides his own self-serving testimony, the record does not contain any other evidence supporting Robert's contention that J.T.'s injuries were caused

18

accidentally.

Furthermore, the testimony at trial establishes that Robert repeatedly engaged in physical altercations with family members, including the punching, kicking and choking of Lucy while she was pregnant. *See Spangler v. Tex. Dep't of Protective & Regulatory Servs.*, 962 S.W.2d 253, 260 (Tex. App.–Waco 1998, no pet.) (holding that the fact finder may consider the alleged abuse of another relative in considering whether a parent's conduct endangers a child and noting that it is not required that the alleged physical abuse occur in the presence of the child); *In re B.R.*, 950 S.W.2d 113, 119 (Tex. App.–El Paso 1997, no writ) (same); *Lucas v. Dep't of Protective & Regulatory Servs.*, 949 S.W.2d 500, 503 (Tex. App.–Waco 1997, writ denied) (holding that a parent's abuse of a spouse can suffice to support termination of the abuser's parental rights); *see also In re E.A.G.*, No. 14-01-01046-CV, 2002 Tex. App. LEXIS 8104, at *15 (Tex. App.–Houston [14th Dist.] Nov. 14, 2002, no pet.) (mem. op.) ("It is self evident that parents perpetrating violence towards certain members of the family threaten the emotional development and well-being of any child.").

Moreover, Robert admitted that he regularly abused illegal drugs before and after J.T.'s birth. *See In re D.C.*, 128 S.W.3d 707, 715-16 (Tex. App.–Fort Worth 2004, no pet.) (holding that a parent's illegal drug use "supports the conclusion that the children's surroundings endangered their physical or emotional well-being"); *see also In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.–Texarkana 2003, pet. denied ) (holding that substance abuse "lends itself to an unstable home environment"). In his testimony, Robert recognized that using drugs around a child would be harmful and emphasized that he and Lucy never abused drugs in the presence of J.T. However, a parent's actions or failures to act need not have been specifically directed at the child or have actually injured the child or even

constituted a concrete threat of injury to the child in order to support a finding of endangerment. *In re M.J.M.L.*, 31 S.W.3d 347, 350 (Tex. App.–San Antonio 2000, pet. denied). Instead, "the statute is satisfied by showing that parental conduct simply jeopardized the child's physical or emotional well-being." *Id.* at 351.

In reviewing the evidence in the light most favorable to the trial court's finding, we conclude that there is legally sufficient evidence to support the trial court's finding that Robert engaged in conduct that endangered the physical or emotional well-being of J.T. constituting a violation of section 161.001(1)(E) of the family code. *See* TEX. FAM. CODE ANN. § 161.001(1)(E); *see also In re J.L.*, 163 S.W.3d at 85-86. In addition, we further conclude that a reasonable fact finder could have formed a firm belief or conviction in the truth of the trial court's finding of endangerment; thus, the evidence supporting the trial court's finding is factually sufficient to support the trial court's finding of a section 161.001(1)(E) violation. *See In re H.R.M.*, 209 S.W.3d at 108.

## B. Best Interest Grounds

Our inquiry, however, does not end with a finding that Robert violated section 161.001(1)(E) of the family code. We must also determine whether the termination of Robert's parental rights was in the best interest of J.T. *See* TEX. FAM. CODE ANN. §§ 153.002, 161.001(2); *see also In re J.L.*, 163 S.W.3d at 84. The evidence adduced at trial indicated that Robert had an extensive history of: (1) family violence; (2) drug abuse; and (3) engaging in various criminal offenses. Robert admitted that he had accidentally injured J.T. on several occasions, resulting in severe head injuries and broken bones. Robert is currently serving a thirty-year prison term, thus undermining the stability of the home. Cornett testified that: (1) J.T. is doing well in her current placement; (2) she recommends that J.T.'s current foster parents adopt her; and (3) J.T. has specialized needs—heart

problems requiring additional treatment. Based on the facts presented to the trial court, we conclude that a trier of fact could have formed a firm belief that termination of Robert's parental rights was in J.T.'s best interest. *See* TEX. FAM. CODE ANN. §§ 153.002, 161.001; *see also Holley*, 544 S.W.2d at 372.

Because "[o]nly one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest," *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003), we need not address Robert's remaining issues on appeal pertaining to sections 161.001(1)(L) and 161.001(1)(O) of the family code. *See* TEX. R. APP. P. 47.1; *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 434 (Tex. App.–El Paso 2004, no pet.); *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.–Houston [1st Dist.] 2003, no pet.); *see also In re C.C.*, No. 13-07-00541-CV, 2009 Tex. App. LEXIS 2239, at *24 (Tex. App.–Corpus Christi Apr. 2, 2009, no pet.) (mem. op.). Accordingly, we overrule all of Robert's issues on appeal.

## VII. LUCY'S ARGUMENTS ON APPEAL

By her first two issues on appeal, Lucy argues that the evidence adduced at trial was insufficient to support the trial court's finding that she endangered the physical or emotional well-being of J.T. *See* TEX. FAM. CODE ANN. § 161.001(1)(E). Lucy specifically asserts that: (1) she did not have personal knowledge about how J.T. was injured; (2) she was very protective of J.T. and looked after J.T.'s physical well-being; (3) she never observed Robert mishandle J.T. in any way; and (4) the record is unclear as to whether Robert's injuring of J.T. was intentional or accidental.

## A. Endangerment of J.T.'s Physical or Emotional Well-Being

At trial, Lucy testified that she had not abused drugs for about two-and-a-half-years,

21

leading up to and possibly including her pregnancy with J.T. In determining whether termination is necessary, we may look to Lucy's conduct both before and after J.T.'s birth. *See In re D.M.*, 58 S.W.3d at 812. Lucy admitted that she regularly abused drugs prior to becoming pregnant. Robert testified that he and Lucy regularly smoked marihuana and "popped pills" after J.T. was born. *See Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 101-02 (Tex. App.–Houston [1st Dist.] 2006, no pet.) (holding that a parent's drug abuse endangers the child's physical and emotional well-being and can support the termination of the parent's parental rights); *see also In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.–Fort Worth 2007, no pet.) (stating that evidence of a parent's unstable lifestyle can support termination); *In re D.C.*, 128 S.W.3d at 715-16 (concluding that a parent's illegal drug use "supports the conclusion that the children's surroundings endangered their physical or emotional well-being")*; In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.–Texarkana 2003, pet. denied) (holding that substance abuse "lends itself to an unstable home environment"). Robert's testimony, however, is somewhat undermined by the fact that all of Lucy's drug screens taken after J.T. was removed tested negative for illegal drugs. Though, we do note the trial testimony demonstrated that Lucy's drug screens were based on her own self-reporting of drug use and, therefore, the results were suspect.

In addition, Lucy testified that Robert kicked her, punched her, and choked her at various points in time while she was pregnant and after J.T. was born. Evidence that a parent did not remove a child from, or allowed the child to remain in, a home in which there was violent conduct supports termination under section 161.001(1)(E). *See In re H.C.*, 942 S.W.2d 661, 665 (Tex. App.–San Antonio 1997, no writ); *see also In re S.M.L.*, 171 S.W.3d at 477; *In re L.S.*, 748 S.W.2d 571, 575 (Tex. App.–Amarillo 1988, no writ) (terminating a

22

mother's parental rights for allowing children to remain in surroundings in which sexual abuse was occurring)). In explaining why she stayed with Robert despite the obvious physical abuse, Lucy blamed herself for agitating Robert and stated that she loved him. Regardless, Lucy was well aware of Robert's tendency to abuse drugs and engage in physical violence. Yet, she chose to continue to allow Robert access to J.T., thus endangering the physical and emotional well-being of J.T. *See In re H.C.*, 942 S.W.2d at 665; *see also In re S.M.L.*, 171 S.W.3d at 477; *In re M.J.M.L.*, 31 S.W.3d at 351; *In re L.S.*, 748 S.W.2d at 575.

The testimony adduced at trial also demonstrated that at the time of trial, Lucy had not found independent housing, and that if Lucy's rights were not terminated, she planned to reside at her mother's home. Lucy, her mother, and Robert all noted that Lucy's father occasionally stayed at the house with Lucy and her mother. Lucy's mother and Robert both stated that Lucy's father was physically abusive and had drug and alcohol problems, which could potentially endanger J.T.'s physical or emotional well-being. *See In re M.J.M.L.*, 31 S.W.3d at 351; *see also In re J.L.W.*, No. 02-08-00179-CV, 2008 Tex. App. LEXIS 8710, at **9-10 (Tex. App.–Fort Worth Nov. 20, 2008, no pet.) (mem. op.) (holding that the evidence was legally and factually sufficient to support the trial court's finding of termination when the evidence revealed that returning the child to the mother would risk the child's emotional and physical well-being because of the couple's past history of domestic abuse and because of the mother's inability to care for her children).

In reviewing the evidence in the light most favorable to the trial court's finding, we conclude that the evidence is legally sufficient to support the trial court's finding that Lucy engaged in conduct that endangered the physical or emotional well-being of J.T. constituting a section 161.001(1)(E) violation. *See* TEX. FAM. CODE ANN. § 161.001(1)(E);

23

*see also In re J.L.*, 163 S.W.3d at 85-86. We further conclude that a reasonable fact finder could have formed a firm belief or conviction in the truth of the trial court's finding of endangerment; therefore, the evidence supporting the trial court's finding of a section 161.001(1)(E) violation is factually sufficient. *See In re H.R.M.*, 209 S.W.3d at 108.

## B. Best Interest Grounds

The record contains conflicting evidence as to whether Lucy actually partook in illegal drug usage after J.T. was born. Regardless, Lucy allowed J.T. to be in contact with Robert, an individual who continuously abused drugs and physically abused Lucy, thus endangering J.T.'s physical and emotional well-being. Furthermore, Falcon testified that Lucy was "naive," "immature," and not capable of caring for J.T. on her own. In addition, several caseworkers stated that they did not observe a bond between Lucy and J.T. Hartley-Harvey noted that she had been working with Lucy for approximately one year and that Lucy refused to implement many of the parenting techniques she was taught. All of the caseworkers indicated that Lucy regularly missed or rescheduled visits with J.T., which suggests that Lucy did not consider these proceedings to be serious in nature. Moreover, Lucy admitted that she did not protect J.T. in the past, and she believed that she required her mother's assistance in caring for J.T. Lucy also admitted at trial that she had not found stable employment. Lucy's mother, however, testified on the following day that Lucy was able to obtain employment at the YMCA in Victoria. No evidence was produced to corroborate Lucy's mother's assertion. Cornett stated that J.T. was doing well in her current placement and recommended that J.T.'s current foster parents adopt her. Based on the foregoing, we conclude that a trier of fact could have formed a firm belief that termination of Lucy's parental rights was in J.T.'s best interest. *See* TEX. FAM. CODE ANN. §§ 153.002, 161.001; *see also Holley*, 544 S.W.2d at 372.

24

As was the case with Robert, because "[o]nly one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest," *In re A.V.*, 113 S.W.3d at 362, we need not address Lucy's remaining issues on appeal pertaining to sections 161.001(1)(L) and 161.001(1)(O) of the family code. *See* TEX. R. APP. P. 47.1; *Perez*, 148 S.W.3d at 434; *In re L.M.*, 104 S.W.3d at 647; *see also In re C.C.*, 2009 Tex. App. LEXIS 2239, at *24. Accordingly, we overrule all of Lucy's issues on appeal.

## VIII. CONCLUSION

Having overruled all of Lucy's and Robert's issues on appeal, we affirm the termination order signed by the trial court.

_____
DORI CONTRERAS GARZA,
Justice

Memorandum Opinion delivered and
filed this the 16th day of July, 2009.

25