# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-24-00017-CV

---

### J. H. and A. L., Appellants

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 22ND DISTRICT COURT OF COMAL COUNTY
### NO. C2023-1171A, THE HONORABLE MELISSA MCCLENAHAN, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

J.H. (Father) and A.L. (Mother) appeal from the trial court's decree of termination, following a bench trial, terminating each of their parental rights to their child, eight-month-old Irene.[1]  In three issues, Mother argues that the evidence is legally and factually insufficient to support the trial court's endangerment and best interest findings as to her and that the trial court erred by appointing the Texas Department of Family and Protective Services (the Department) as Irene's managing conservator.  In one issue, Father argues that the evidence is legally and factually insufficient to support the trial court's endangerment and constructive abandonment findings as to him.  For the following reasons, we affirm the trial court's decree of termination.

---

[1]  To protect the child's privacy, we refer to her by a pseudonym, her parents by their initials or as Mother or Father, and other persons by their relationship to the child.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

## BACKGROUND

On May 5, 2023, the Department received a report of abuse or neglect of Irene, who was approximately six weeks old. The referral alleged physical abuse of Irene by Father, including "throwing" her into a car seat and grabbing her by the neck. In response, the Department contacted Mother to discuss concerns about Father's treatment of Irene and created a safety plan that included Father's vacating the residence. The Department also contacted Father, who denied that he had handled Irene aggressively. Throughout May and June, the Department met with Mother and other household members to discuss steps necessary to keep Irene safe, including implementing supervised visits with Father and drug screening for Mother. The Department received a second report on June 26, 2023, again alleging physical abuse of Irene by Father. The report alleged that after a visit with Father, Irene had a bruise on her tongue and left cheek. After the second referral, the Department contacted Mother, who stated that the mark on Irene's tongue resulted from a recent hospital visit where Irene was seen for a fever. The Department sent photos of Irene to the Forensic Assessment Center Network, which expressed concern about Irene's injuries and requested that she be taken to a hospital for a full evaluation. The Department advised Mother to take Irene to the Christus Children's Emergency Room for an examination.

The examination revealed that Irene had subconjunctival hemorrhages in her eyes in addition to the bruising on her tongue and cheek. Irene also had corner fractures in both femurs and a healing radius fracture. The forensic supervisor at Children's Hospital of San Antonio advised the Department that Irene was admitted to the hospital due to the new injuries discovered and because of Mother's inability to provide any explanation for the injuries.

A physician informed the Department that Irene's three acute injuries—to the cheek, tongue, and eyes—were, in his opinion, non-accidental and a result of physical abuse. The physician also informed the Department that Irene had fractures of her fingers, referred to as "classic metaphic leguin," which are forceful fractures resulting from physical abuse.

On June 28, 2023, the Department filed a petition requesting to take possession of Irene under Family Code section 262.101, which authorizes possession without prior notice and hearing when there is immediate danger to the child's physical health, continuation in the home would be contrary to the child's welfare, and there is no time for a full adversary hearing. *See* Tex. Fam. Code § 262.101. The petition also sought appointment of the Department as Irene's temporary sole managing conservator and termination of Mother's and Father's parental rights. The petition was supported by an eight-page affidavit recounting the circumstances necessitating Irene's removal. The affidavit described the allegations of physical abuse of Irene and also noted that Mother was "deceitful" in responses to questions about Irene's injuries, that Mother had no explanation for those injuries, and that Father denied harming Irene, and described household members' failure to successfully implement the safety plan created by the Department. The affidavit stated that "none of the caregivers have been able to provide any explanation for the injuries which, according to medical experts, are consistent with abuse" and Irene's continuing to be in the home "would be contrary to [her] welfare because [she] is of a vulnerable age, unable to self-protect, and has already suffered numerous injuries at only 2 months old."

That day, the trial court found that Irene's remaining at Mother's and Father's home would be contrary to her welfare, that there was no time for a full adversary hearing consistent with the circumstances and providing for Irene's safety, and that the Department had made reasonable efforts to prevent or eliminate the need for removal. The court appointed the

3

Department as Irene's temporary sole managing conservator and set the case for a full adversary hearing on July 14, 2023. The court appointed an attorney ad litem for Irene and counsel for Mother and Father. The court also ordered Mother and Father to submit to hair-based drug screening and for a hair-based drug screen to be performed on Irene by June 30.

On July 13, 2023, the Department filed with the court business records containing the results of the drug testing. Irene's hair tested positive for methamphetamine; Mother's hair tested positive for amphetamine, marijuana, and methamphetamine; and Father's hair tested positive for marijuana and methamphetamine. That day the Department filed a motion for accelerated trial on the merits requesting the court to find aggravated circumstances under Family Code section 262.2015, which permits the court to waive the requirement of a service plan and the requirement to make reasonable efforts to return the child to a parent and to accelerate the trial schedule if the court finds that the parent has subjected the child to certain aggravated circumstances. *See id.* § 262.2015. The Department identified the aggravated circumstances as Irene's bodily injuries and her testing positive for methamphetamine. *See id.* § 262.2015(b)(2).

In August 2023, after a "family team meeting" that neither Mother nor Father participated in but which their court-appointed counsel attended, the Department filed a Family Plan for Mother, with the stated primary permanency goal of family reunification and concurrent permanency goal of adoption. At that time, Irene had been placed in a foster home where she was adjusting well to the routine, was bonding with her foster parents, and where her needs were being met. The plan's goals for Mother were that she abstain from drug and alcohol use, engage in outpatient substance abuse therapy, educate herself through resources on protective parenting skills and use those skills in her daily life, and display behavioral changes that reflect

4

improvement in decision making about the people with whom she surrounds herself. Mother was directed to maintain legal and stable employment, attend parenting classes to learn appropriate and protective parenting skills, maintain safe and hazard-free stable housing that is appropriate for Irene, refrain from participating in any criminal activity, and not reside with anyone with a CPS or criminal history or who is a registered sex offender. Mother was also directed to participate in random drug testing and undergo a psychological evaluation to determine any mental health needs as well as complete a domestic violence course or therapy with a focus on domestic violence and protective parenting. The Department filed a Family Plan for Father that was in most respects the same as Mother's.

In mid-September the Department filed a Permanency Report to the Court. The report stated that Irene, then five months old, was placed with paternal fictive kin, appeared to be a very social infant who sleeps well, and was reported to eat well throughout the day. The report stated that Mother had engaged in some parenting classes. Although Mother missed her scheduled substance abuse services screening appointment, she had rescheduled it for the end of September. Father, however, had not completed any of the tasks set forth in the Family Plan and was arrested on August 21, 2023, for aggravated injury to a child or elderly person and bond forfeiture.[2] Although released on bond, Father missed his scheduled substance abuse services screening appointment and had not rescheduled it. The permanency report stated that "aggravated circumstances remain in effect for the parents," and the Department's recommendation was that it continue as Irene's temporary managing conservator, that her placement be continued, and that a trial be held in December 2023. The trial court signed an

---

[2] The permanency report describes the arrest as one for "injury child/elderly/disable w/int sbi/mental (aggravated) and bond forfeiture unlawful carrying weapon: pistol."

5

order finding that aggravated circumstances existed as to both Mother and Father and that the requirements to implement a service plan for Mother and for Father should be waived and the trial schedule accelerated pursuant to Family Code section 262.2015(a). The court set the case for trial on December 8, 2023. The court also ordered Mother and Father to submit to a hair-based drug screen by September 30. The Department filed with the court business records containing the results of the September drug testing. Mother and Father both tested positive for marijuana.

The trial court held a bench trial on December 8 and 14, 2023. On December 8, the Department offered as exhibits Mother's and Father's drug test results. When the trial resumed on December 14, the court heard testimony from Dr. Lora Spiller, the child abuse pediatrician who examined Irene in the hospital and in her clinic; Angela Rios, the former Department permanency specialist for the case; Alexandra Smith, the current Department permanency specialist for the case; and Toni Urban, Irene's court appointed special advocate (CASA). Although Mother was present for the proceedings on December 8, Father did not attend either trial date and the record is unclear as to whether Mother was present for the December 14 proceedings. Neither Mother nor Father testified at trial.

Spiller testified that she was employed as a child abuse pediatrician with UT Health San Antonio and was also the medical director of the Forensic Nurse Examiner Program at Christus Children's Hospital. Spiller detailed her educational background and professional training, including undergraduate degrees in psychology, biology, and chemistry and a medical degree obtained in 2011. She then completed three years of training in pediatrics and became a board-certified general pediatrician. After three additional years of subspecialty training at UT Health San Antonio focusing solely on child abuse pediatrics, Spiller became board certified in

6

child abuse pediatrics. Spiller testified that since then she has participated in continuing medical education by both attending conferences and making presentations to other physicians. In her practice as a child abuse pediatrician, Spiller sees patients in her clinic and in an outpatient setting as well as hospitalized patients when there are concerns about child maltreatment. Spiller testified that she was on call the week the Department sent photographs of Irene's injuries and, because of Irene's age, determined that she needed emergent evaluation because of a high risk for abuse based on her age and the injuries. Spiller requested that Irene be brought in for a forensic evaluation. During that evaluation, Spiller took additional photographs of Irene's injuries and those photographs and the ones taken by the Department were admitted into evidence at trial. Spiller testified that the photographs depicted a purple bruise on the tip of Irene's tongue, which Spiller identified as one of several "sentinel" injuries to Irene. Spiller explained that a sentinel injury is one seen in infants that, although seemingly minor, is inadequately explained by routine handling of the infant and that the infant could not have produced the injury to herself because of her stage of development. Spiller stated that sentinel injuries often precede more serious injuries, and that "one of our classical sentinel injuries we see is bruising to the tip of the tongue" resulting from "forceful insertion of an object into the mouth of an infant." Spiller testified that the photographs also depicted green and brownish bruising along Irene's mandible, along with some dry skin abrasions. Spiller stated that the bruising was concerning to her because it indicated that Irene had either an impact to or a squeeze to her face. Spiller stated that when she discussed the facial bruising with Irene's parents, she was not provided with any explanation for it. When asked about the photographs taken by the emergency room forensic nurse examiners on June 27, Spiller testified that they showed subconjunctival hemorrhages in both of Irene's eyes. Spiller stated that bilateral subconjunctival hemorrhages

are seen in infants if there has been direct impact to the eyes or sometimes in cases of strangulation. Spiller testified that those were the only two ways this infant could have suffered this particular injury. Spiller also testified about photographs depicting abrasions on Irene's chest and, although Spiller stated that she was more concerned about bruising than abrasions, she was not provided an explanation for the abrasions either, which was concerning because of Irene's young age.

Spiller explained that any time she sees an infant or child under 24 months of age with concerns for maltreatment, she orders a skeletal survey—a collection of x-rays of all the bones of the body—looking for fractures. In Irene's case, the survey revealed two fractures Spiller identified as "classic metaphyseal lesions," which are fractures of the femur just above the knee. Spiller stated that the nature of the fractures was also confirmed by a pediatric radiologist. Spiller testified that these are a type of fracture highly specific for child maltreatment and are on "the very short list of fractures in that specific category for child abuse." Spiller explained that those types of fractures are only seen in infants and occur when the infant's leg is "forcefully yanked."[3] Spiller explained that she also sees this type of injury in children who have been shaken when the legs are flailing "with such extreme force that the ends of the bones chip off." Spiller opined that Irene had been yanked, rather than shaken, because there were no abnormalities in her cranial CT scan that indicated she had been shaken. The trial

---

[3] At that point in her testimony, counsel for Father took Spiller on voir dire and questioned her qualification to interpret x-rays. Spiller explained that every week she meets with a pediatric radiologist to go over every x-ray, head CTI, and brain MRI done on every patient presenting with concerns for maltreatment. She also stated that she has published research about interpreting x-rays in the Journal of Pediatric Radiology. The trial court overruled counsel's objection to Spiller's testimony regarding Irene's x-rays and that ruling was not challenged on appeal.

court admitted into evidence Irene's medical records containing both the pediatric radiologist's report and Spiller's findings regarding Irene's injuries.

In addition to the skeletal survey, Spiller testified that she did head imaging, which identified no abnormalities, as well as blood work that ruled out any bleeding disorders that would cause Irene to bruise easily. Spiller discussed the injuries she observed with Mother, who provided no explanation for what may have caused them. Mother did, however, provide Spiller with an explanation for a facial bruise noted in a previous medical record. Mother's explanation for that bruise was that during hospitalization to treat a fever, Irene hit herself in the face with an IV inserted into her hand. Spiller testified that it was not plausible that a 60-day old baby could cause that type of injury to herself. Based on her evaluation of Irene's injuries, Spiller determined that she wanted to have a follow-up visit before making a final determination. Spiller stated that the follow-up visit occurred in July 2023, after Irene had been in foster care for approximately one month. Spiller testified that Irene's previous bruises had resolved and the follow-up skeletal survey was completely normal with complete resolution of the previously seen femur fractures. Spiller explained that the constellation of findings including the bruising and femur fractures, coupled with no explanation for them, led her to determine that there was no other explanation for Irene's injuries than "inflicted injury."

When asked on cross-examination about Spiller's conversations with Mother, Spiller stated that, although cooperative, Mother seemed to be a "very poor historian" whose "timeline was off" and who was unable to "give clear answers" to questions about Irene's injuries. Spiller testified that Mother denied knowing how Irene's injuries occurred.

After the Department offered, and the trial court admitted into evidence, Mother's and Father's June 2023 drug tests, each of which were positive for methamphetamine, marijuana,

or both, the court heard testimony from Rios, who acted as a permanency specialist for Irene's case. Rios testified that Irene was brought into the Department's care because of concerns that the two-month-old baby had been physically abused. Rios explained that, prior to the court's entering a finding of aggravated circumstances that waived the requirement that the Department create a Family Plan in the case, the Department created one for Mother and Father in August 2023 and attempted to get Mother and Father engaged with the recommended services immediately. Rios described the contents of Mother's and Father's family plans. Rios testified that, as part of the service plan, Mother was recommended for outpatient treatment for substance abuse. Rios stated that during her time working on the case Mother had made efforts to, but had not, engaged in outpatient treatment. Father was also recommended for outpatient treatment for substance abuse but, like Mother, had not engaged in that treatment while Rios was working on the case. Rios stated that Mother was last known to be residing at her mother's home in New Braunfels, which Rios did not consider to be a safe home for Irene because the power to the home was often out, creating an unsafe environment for an infant. Rios testified that Mother had made "minimal" changes in her behavior and Father had made absolutely no changes in the behavior that led the Department to remove Irene from their care. Rios stated that Father was very inconsistent in his communication with her while she was working on the case and that he had failed to show up to meetings scheduled in September, October, and November 2023. Rios testified that during that time he had been incarcerated and bonded out and that he had failed to keep her updated with his contact information or make any effort to ask about Irene. Rios stated that Father had inconsistently engaged in parenting classes and had failed to show up for a scheduled visit with Irene in July.

Rios testified that, since being in foster care, Irene has suffered no further injuries. Rios explained that Irene was placed with fictive kin where she has been thriving. Rios stated that Irene was very bonded with her caregiver, who was providing appropriate care for Irene. Rios testified that she believed termination of Mother's parental rights was in Irene's best interest because Mother had ample time to engage in outpatient substance abuse treatment but had not done so until October 2023. Rios stated that she might feel differently if Mother had "made better choices or understood the severity of having a legal CPS case." Rios testified that Mother was not meeting Irene's needs, particularly given the severity of Irene's injuries and her vulnerability due to her young age. As to Father, Rios testified that she believed termination of his parental rights was in Irene's best interest because he had made "barely any effort at all in this case" and that his lack of communication with her demonstrated to her that Father had not prioritized trying to understand how to be a better parent or be present in Irene's life. Rios stated that Father had not asked for any pictures of Irene, had not asked how she was doing, and only avoided an unsuccessful discharge from a parenting class because of her intervention by meeting with his parenting coach and supervisor.

Rios stated that she learned that Mother had recently gotten a job at a gas station and had started outpatient therapy for substance abuse in December. She agreed that Mother had maintained contact with Rios and constantly asked about Irene, including asking for pictures and videos of Irene once or twice a month. Rios stated that Mother had, on her own initiative, bought clothing, toys, and miscellaneous items for Irene that were given to Irene's foster parent. Rios also stated that she recently learned that Mother had completed her eighth parenting class the previous week. Regarding Father, Rios testified that he never offered any explanation to her about how Irene was injured and that her communication with him was virtually nonexistent.

11

Rios stated she knew Father had been arrested for bodily injury to a child or elderly person and that she believed the alleged victim was Irene but did not know how he came to be arrested for that charge.

The trial court then heard testimony from Smith, the permanency specialist appointed to the case in November 2023 to replace Rios. Smith testified that she had just received a certificate indicating Mother's completion of a parenting class, but that neither Mother nor Father had completed any outpatient substance abuse treatment. Although Smith had not been able to make contact with Father, she had spoken to Mother and confirmed that other than the parenting class, she had not engaged in any additional services. When asked why the Department was seeking termination of Mother's and Father's parental rights, Smith explained that for the duration of the case the parents have not demonstrated that they can care for Irene. Neither had completed the services the Department required to alleviate its concerns and neither had provided an explanation for what happened to Irene. Smith also stated that Mother's and Father's drug use was "a big issue for the parents in this case" and that drug use continued to be a problem throughout the case. Smith testified that she believed Mother and Father would continue to use drugs if Irene were to return to their care. Smith stated that termination of Mother's and Father's rights was in Irene's best interest because she is currently in a safe and stable environment where her needs are being met. Smith visited Irene at her placement and found that Irene was comfortable in the home, was starting to crawl and pull up on things, and was very bonded with her caregiver.

The last witness to testify was Urban, Irene's CASA, who testified that she visits Irene at her foster placement or at the church where her foster parent works every two weeks. Urban stated that Irene is doing very well developmentally and is very attached to her caretaker

12

and looks to her when she is feeling sleepy or hungry. Urban testified that, during visits, Irene babbles and smiles and responds to silly voices and noises. Urban described Irene's development as very good and stated that she crawling on all fours, pulls herself up on furniture, and pushes herself into a sitting position. Urban testified that she has personally met with Mother and Father as well as having telephone conversations with them. Urban's impression of both Mother and Father was that they were immature and not aware of the seriousness of the situation. Urban expressed concern about Mother's and Father's continued drug use as well as being concerned about the injuries Irene had sustained prior to the Department's involvement. Urban explained that she believed termination of Mother's and Father's parental rights to Irene was in her best interest because Irene is in a very good placement; she is attached to her foster parent, whom she knows as her mother; and because Mother and Father lack the ability to provide for Irene emotionally or physically. Irene's current foster placement has a lot of support from family, friends, and her church community; provides Irene with appropriate toys and care; and Irene looks to her foster parent for comfort as she would to a mother; and Urban testified that being able to remain in that environment was in Irene's best interest.

In its order of termination, the trial court found by clear and convincing evidence that statutory grounds (D) and (E) applied as to Mother and that termination of her parental rights to Irene was in the child's best interest. *See* Tex. Fam. Code §§ 161.001(b)(1)(D) (endangering environment), (E) (endangering conduct), (2) (addressing best interest). The court found by clear and convincing evidence that statutory grounds (D), (E), and (N) applied as to Father and that termination of his parental rights was in the child's best interest. *See id.* §§ (D), (E), (N) (constructive abandonment), (2). This appeal followed.

13

**ANALYSIS**

**Standard of Review**

To terminate parental rights under Section 161.001, the Department has the burden to prove by clear and convincing evidence one of the statutory predicate grounds and that termination is in the best interest of the child. *See* Tex. Fam. Code § 161.001(b)(1), (2); *In re R.R.A.*, 687 S.W.3d 269, 271 (Tex. 2024); *In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *see also* Tex. Fam. Code § 161.206(a). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007.

"In conducting a legal-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding." *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). Legal sufficiency review of the evidence to support a termination finding requires a court to look at all the evidence in the light most favorable to the finding and consider undisputed contrary evidence to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Id.* at 631. In reviewing the factual sufficiency of the evidence under the clear-and-convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

We must give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108–09 (Tex. 2006); *see In re C.E.*, 687 S.W.3d at 314 (stating that factfinders are "sole arbiters of the credibility of the witnesses and the weight to give to their testimony" and "entitled to choose to believe one witness and disbelieve another with respect to the disputed facts of this case"); *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (stating that when reviewing termination order, appellate courts defer to "decisions of the factfinder who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses").

**Endangerment Findings**

In her first issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings of statutory grounds. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E). We therefore review the trial court's endangerment findings—that (i) Mother knowingly placed or knowingly allowed Irene to remain in conditions or surroundings which endangered Irene's physical or emotional well-being, and (ii) Mother engaged in conduct or knowingly placed Irene with persons who engaged in conduct which endangered Irene's physical or emotional well-being. *See id.*; *In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (per curiam) (explaining that only one statutory ground is necessary to support termination of parental rights when there is also best interest finding but requiring appellate court to detail analysis in appeal challenging termination under (D) and (E) grounds because of "due process concerns, coupled with the requirement for a meaningful appeal"); *see also In re R.R.A.*, 687 S.W.3d at 279 (reviewing termination under (D) and (E) grounds "because a finding of

15

termination under those grounds may justify termination of parental rights to other children under subsection (M)").

"'Endanger' means 'to expose to loss or injury; to jeopardize.'" *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone." *Pruitt v. Texas Dep't of Family & Protective Servs.*, No. 03-10-00089-CV, 2010 WL 5463861, at *4 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.). "It is not necessary that the conduct be directed at the child or that the child actually suffer physical or emotional injury," the conduct does not have to occur in the presence of the child, and courts may look to conduct "before the child's birth and both before and after the child has been removed by the Department." *Id.*; *see In re C.E.*, 687 S.W.3d at 310 (stating that (D) and (E) grounds "do not require that endangering 'conduct be directed at the child' or that the child 'actually suffer[] injury'" (quoting *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022))). "Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Pruitt*, 2010 WL 5463861, at *4.

The relevant inquiry under paragraph (E) is whether evidence exists that the endangerment of the child's well-being "was the direct result of Appellant's conduct, including acts, omissions, or failures to act." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet denied.); *see In re C.E.*, 687 S.W.3d at 310 (stating that paragraph (E) "requires that a parent's conduct endanger the child's physical or emotional well-being" but that "[p]roof that a parent specifically caused an injury is not necessary"). "Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *In re M.E.-M.N.*,

16

342 S.W.3d at 262. In contrast, the relevant inquiry under (D) is whether the child's environment, including the child's living conditions and conduct by parents or others in the home, endangered the child's well-being. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.); *see In re C.E.*, 687 S.W.3d at 310 (stating that "termination under (D) requires that the child's environment is a source of endangerment, and the parent's conduct may create that dangerous environment"). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home—including physical violence or abusive conduct by one parent toward the other parent—is part of the 'conditions or surroundings' of the child's home under subsection (D)." *V.P.*, 2020 WL 544797, at *4 (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.)). Because the evidence pertaining to (D) and (E) is interrelated, we consolidate our review of the evidence. *See id.* At *4 (citing *In re M.R.J.M.*, 280 S.W.3d at 503).

### Endangerment finding as to Mother

Mother argues that Irene's bruising occurred "while she was hospitalized and Father was present" and that she was not present at the hospital. Mother points to medical records that state that Irene had a "purple bruise on right lip, likely from hitting IV cover on her mouth." Mother also asserts that during the weekend prior to her hospitalization in June, Irene was with Father, unsupervised, and that Father, not Mother, was arrested for injury to a child. Mother argues that she was not the person who permitted Irene to be with her Father for an unsupervised visit but, rather, Irene's Paternal Grandmother was the person who allowed it. In essence, Mother admits that Irene was injured, but that there was no evidence that Mother was the person who inflicted the injury. Mother blames Paternal Grandmother, who she states was

17

part of a discussion about the need for Father's visits with Irene to be supervised, for allowing Irene to be alone with Father. Mother maintains that "all evidence of endangering behavior and poor parenting points to Father."

Even assuming that Mother was not the person who directly caused the injuries to Irene, as previously noted, "it is not necessary that the endangering 'conduct be directed at the child' or that the child 'actually suffer injury.'" *See In re C.E.*, 687 S.W.3d at 310. There was evidence that Mother allowed Irene to be in the care of Father, the person she asserts injured Irene. Endangering conduct involves not only acts, but also omissions or failures to act. *See In re M.J.M.L.*, 31 S.W.3d 347, 350 (Tex. App.—San Antonio 2000, pet. denied). Allowing a child to remain in an abusive home environment may constitute sufficient evidence to support an endangerment finding under subsection (D) and (E). *In re H.C.*, 942 S.W.2d 661, 666 (Tex. App.—San Antonio 1997, no writ).

In this case, the investigator and others also testified about the Department's concerns because of Mother's drug use, lack of stable housing, and inability to safely care for Irene. The trial court admitted evidence of drug testing showing that, when Irene was in her care, Mother had been using methamphetamines and marijuana, and Irene, at six weeks old, tested positive for methamphetamine in a hair-based drug screen. Mother also again tested positive for marijuana after Irene had been removed from her care. Despite being ordered to address substance abuse issues, Mother continued to use drugs during the pendency of the case. A parent's use of illegal drugs and the effect on her life and parenting ability may establish endangering conduct and an endangering environment under subsections (D) and (E). *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009); *In re K.A.C.*, 594 S.W.3d 364, 373 (Tex. App.—El Paso 2019, no pet.); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist. 2014,

pet. denied). "Further, evidence that the parent continued to use illegal drugs even though the parent knew her parental rights were in jeopardy is conduct showing a voluntary, deliberate, and conscious course of conduct which endangers a child's well-being." *In re K.A.C.*, 594 S.W.3d at 373. The Texas Supreme Court has confirmed that endangerment does not require a parent's drug use to directly harm the child. *In re R.R.A.*, 687 S.W.3d at 278. "Instead, a pattern of parental behavior that presents a substantial risk of harm to the child permits a factfinder to reasonably find endangerment." *Id.* Here, Irene herself tested positive for methamphetamine, confirming that Mother's drug use created a substantial risk of harm to Irene. This evidence alone permitted the factfinder to reasonably find endangerment to Irene by Mother. *See in re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) ("Evidence of a parent's drug use, or evidence that another parent allowed a child to be around a parent or other persons using drugs, can support the conclusion that the child's surroundings endanger her physical or emotional well-being under subsection (D) and can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being under subsection (E).").

Viewing the evidence under the applicable standards of review, we conclude that it was legally and factually sufficient to support the endangerment findings against Mother. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re A.C.*, 560 S.W.3d at 630-31. Thus, we overrule Mother's first issue.

### *Endangerment finding as to Father*

Father argues that, although Spiller testified that Irene's injuries had to be inflicted by someone, she did not know who that person was. Father also relies on Smith's testimony that she did not know who had inflicted the injuries on Irene. Father argues that

19

neither the evidence of his drug use nor the injuries to Irene can support an endangerment finding against him. We disagree. As an initial matter, Father did not personally appear or testify at trial, nor did he ever attempt to provide the Department with an explanation of how Irene sustained her serious injuries. *See In re J.D.*, 436 S.W.3d 105, 114 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("A child's unexplained, non-accidental fractures of various ages support a reasonable inference that the child's caregivers knew of the injuries and their cause, and supports termination under subsection D."). There was evidence presented at trial that Irene had been cared for only by Mother, Father, Paternal Grandmother, and Maternal Grandmother. Father points to no evidence in the record that he ever denied causing injury to Irene and, if there were any, the factfinder could have discredited that evidence and determined that Father, rather than Mother or the grandparents inflicted Irene's injuries. *See In re C.E.*, 687 S.W.3d at 314.[4]

Moreover, as previously discussed, the evidence of Father's drug use while Irene was in his care and during the pendency of the case, coupled with Irene's hair-based drug screen testing positive for methamphetamine, is sufficient to support endangerment findings as to him. *See In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) ("Evidence of a parent's drug use, or evidence that another parent allowed a child to be around a parent or other persons using drugs, can support the conclusion that the child's surroundings endanger her physical or emotional well-being under subsection (D) and can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being under subsection (E).").

---

[4] The record also included evidence that, shortly after Irene was removed by the Department, Father was arrested for assault with bodily injury against a child or elderly or disabled person. Although there was no direct evidence that the person allegedly assaulted was Irene, Rios testified that she believed that it was Irene. And evidence of Father assaulting another person supports a determination that he, rather than Mother or the grandparents, injured Irene.

Viewing the evidence under the applicable standards of review, we conclude that it was legally and factually sufficient to support the endangerment findings against Father. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re A.C.*, 560 S.W.3d at 630-31. Thus, we overrule Father's challenge to the endangerment findings under subsections (D) and (E) and do not address his challenge to the constructive abandonment finding under subsection (N). *See In re N.G.*, 577 S.W.3d at 232-33.

**Best Interest**

Relevant factors in assessing the best interest of a child include: (i) the desires of the child, (ii) the stability of the home or proposed placement, (iii) parental abilities, (iv) the emotional and physical needs of the child now and in the future, (v) the emotional and physical danger to the child now and in the future, (vi) the plans for the child by the individual or agency seeking custody, (vii) the programs available to assist the individuals seeking custody to promote the best interest of the child, (viii) acts or omissions by the parent showing that the parent-child relationship was not proper, and (ix) any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). No one factor is controlling, evidence on each factor is not required, and evidence presented to satisfy the predicate-ground finding may also be probative of the child's best interest. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *Pruitt*, 2010 WL 5463861, at *7.

The evidence at trial established that Mother completed a parenting class; had attempted to, and perhaps might have recently, begun outpatient therapy for substance abuse; had obtained employment; had participated in supervised visitation with Irene and purchased her clothes and toys; and expressed interest in Irene's welfare while in foster care. However, there was also significant evidence of Mother's endangering conduct, including Mother's use of methamphetamine while Irene was in her care, Irene's hair-based drug screen testing positive for methamphetamine, and the serious injuries Irene suffered before her removal by the Department. Moreover, Mother continued to test positive for drugs after Irene's removal and made minimal progress in addressing the concerns the Department identified in its Family Plan for her. *See Holley*, 544 S.W.2d at 371-72 (including parental abilities and danger to child now and in future among relevant factors in assessing child's best interest); *In re M.S.L.*, No. 14-4-00382-CV, 2014 WL 5148157, at *17 (Tex. App.—Houston [14th Dist.] Oct. 14, 2014, no pet.) (mem. op.) ("The failure to comply with a service plan can support the trial court's best interest finding.").

Mother did not testify at trial or otherwise adduce evidence regarding her ability to see to Irene's daily needs if she were returned to her care, the stability of the home she would provide for Irene, her plans for Irene's future, or any excuses for her conduct while Irene was in her care. *See In re A.R.R.*, No. 01-18-00043-CV, 2018 WL 3233334, at *7 (Tex. App.—Houston [1st Dist.] July 3, 2018, pet. denied) (mem. op.) (mother's failure to adduce evidence of her ability to care for children or of secure housing supported trial court's determination that mother was not capable of seeing to their needs). The Department's witnesses testified consistently to their belief that it was in Irene's best interest for Mother's parental rights to be terminated and that Irene should not be returned to Mother's care. Neither Mother nor any other witness controverted or questioned the Department's and the CASA's recommendation.

22

The trial court also reasonably could have considered Irene's vulnerable age, her bond with her foster placement, and the evidence of the foster parent's care of Irene after she was placed with her. *See Holley*, 544 S.W.2d at 371-72. The evidence showed that Irene was thriving and happy in the foster parent's care and that her needs were being taken care of. *See In re J.M.*, 156 S.W.3d 696, 706 (Tex. App.—Dallas 2005, no pet.) (when child is too young to articulate desires, court considers quality and extent of child's relationships with prospective placements).

Viewing the evidence under the applicable standards of review, we conclude that the evidence was legally and factually sufficient to support the trial court's best interest finding. *See* Tex. Fam. Code § 161.001(b)(2); *In re A.C.*, 560 S.W.3d at 630-31. We overrule Mother's second issue.

## Conservatorship

In her third issue, Mother asserts that the evidence is legally and factually insufficient to overcome the presumption that Mother be appointed Irene's conservator. We have, however, already concluded that the evidence was sufficient to support the trial court's endangerment and best-interest findings. In this context, Mother does not have standing to challenge the portion of the decree appointing the Department as Irene's managing conservator. *See In re J.D.G.*, 570 S.W.3d 839, 856 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (explaining that order terminating the parent-child relationship divests parent of legal rights and duties with respect to child (citing Tex. Fam. Code § 161.206(b))); *see also A.P. v. Texas Dep't of Family & Protective Servs.*, Nos. 03-18-00780-CV, 03-18-00781-CV, 2019 WL 1342163, at *1 (Tex. App.—Austin Mar. 26, 2019, no pet.) (mem. op.) (concluding in context of parents'

23

appeal from judgment terminating their parental rights, that parents lacked standing to challenge trial court's striking of grandmother's petition in intervention and collecting cases in which court concluded that appealing parent lacked standing to complain of errors that did not injuriously affect them or that affected rights of others); *In re H.M.M.*, 230 S.W.3d 204, 204-05 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (holding court lacked jurisdiction to consider mother's appeal of trial court's failure to grant sole custody to her father after it terminated her parental rights). Further, once an appellate court overrules a parent's challenge to an order terminating the parent's rights, the trial court's appointment of the Department as sole managing conservator may be considered a "consequence of the termination." *See In re J.D.G.*, 570 S.W.3d at 856 (citation omitted). We overrule Mother's third issue.

## CONCLUSION

Having overruled Mother's and Father's issues, we affirm the trial court's decree of termination.

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Kelly and Theofanis

Affirmed

Filed: July 3, 2024

24